## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BENJAMIN COOPER, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JOHN WETZEL, et al., | : | NO. 20-cv-04595-RAL |
| Defendants, | : | |

**RICHARD A. LLORET**                                          **July 11, 2022**
**U.S. Magistrate Judge**

### <u>MEMORANDUM OPINION</u>

Plaintiff Benjamin Cooper brought suit pursuant to 42 U.S.C. § 1983 against SCI-Phoenix Unit Manager Jaime Luquis, alleging that Unit Manager Luquis was deliberately indifferent toward Cooper's serious medical need, in violation of the Eighth Amendment, by failing to ensure he was properly placed in a bottom bunk. Mr. Cooper has a seizure disorder and he suffered physical injury when he fell out of a top bunk in his cell. On April 5, 2022, I presided over a one-day bench trial in this matter. The parties submitted post-trial briefing proposing findings of fact and conclusions of law. *See* Doc. No. 77 (Def.); Doc. No. 79 (Pl.). Unit Manager Luquis also filed a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50. Doc. No. 77, 78. Mr. Cooper responded to the motion. Doc. No. 80.

After considering the evidence presented at trial and the parties' post-trial briefing, I find that Unit Manager Luquis was not deliberately indifferent to Mr. Cooper's serious seizure disorder, as he appropriately took steps to assign Mr. Cooper to a bottom bunk, may not have been aware of Mr. Cooper's seizure disorder, and was not directly responsible for enforcement of his bunk assignment. Even were I to conclude

that any of Unit Manager Luquis's conduct was unreasonable, none of his conduct would rise to more than negligence. I deny Unit Manager Luquis's motion for judgment as a matter of law and will make findings of facts and conclusions of law in this matter, pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

Mr. Cooper, who was diagnosed with a seizure disorder as a young child, entered the custody of the Pennsylvania Department of Corrections ("Department") in 2005. Transcript of Trial Held on April 5, 2022 ("Tr."), Doc. No. 75, 10:17–19; 11:3–5. In July 2018, Mr. Cooper moved from SCI-Graterford to a newly opened prison, SCI-Phoenix. Tr. 11:19–25; 12:1–7. Approximately 2,700 prisoners were transferred from SCI-Graterford to SCI-Phoenix in July 2018. Tr. 110:24–111:1. When he arrived at SCI-Phoenix in July 2018, Mr. Cooper was assigned to E-Block, in cell 2027 and bed 01, which meant that he was assigned to a bottom bunk in a cell on the top tier of the block. Tr. 12:8–22; 29:23–30:6; Ex. D-1.

When SCI-Phoenix opened in July 2018, Unit Manager Luquis was the unit manager for D-Block, which housed approximately 250 inmates. Tr. 111:8–20. SCI-Phoenix faced a shortage of unit managers following the July 2018 transfer from SCI-Graterford, and unit managers were assigned additional responsibilities in conjunction with the transfer process through at least August 2018. Tr. 111:21–112:17. Sometime in August 2018, Unit Manager Luquis was assigned to be unit manager of E-Block, in addition to staying as unit manager of D-Block, which made him responsible for an additional 250 inmates. Tr. 112:18–113:6; 117:12–14.

"There is a difference between a bunk status and a bunk assignment. A bunk status is a general designation sometimes made by prison medical staff in consideration

2

of a prisoner's medical condition." Pretrial stipulation; *see also* Tr. 93:11–21. A bunk assignment is an inmate's particular cell number and bed number—that is, top or bottom bunk—given by unit staff, typically the unit manager, that dictates where that inmate sleeps. Tr. 93:22–25; 107:23–108:24.

Mr. Cooper was assigned to cell 2027, bed 01 until August 13, 2018. Ex. D-1. On August 13, 2018, Mr. Cooper went to a medical appointment, where he asked for and was given bottom bunk status for the first time. Ex. D-8 ("will request bottom bunk status"); Ex. D-13 (under "Medical Housing Recommendations," noting "Lower bunk" status effective 8/13/2018). On August 14, 2018, Mr. Cooper moved to cell 2024, which was on the top tier in E-Block. Ex. D-1; Tr. 15:18–21. In cell 2024, Mr. Cooper was assigned to the bottom bunk. Ex. D-1. Mr. Cooper says that he complained to Sgt. Keith Whitman that he had been improperly assigned to a cell on the top tier, erroneously believing that he had been given bottom tier status by medical. Tr. 16:12–23. On August 20, 2018, Mr. Cooper went back to medical "requesting lower tier" status. Ex. D-9. That same day, Mr. Cooper was given, for the first time, lower tier status. Ex. D-9 (noting "lower tier ordered"); Ex. D-13 (reflecting "Ground level" status effective 8/20/2018).

On August 23, 2018, Unit Manager Luquis changed Mr. Cooper's assignment to cell 1004, which is on the lower tier, and bed 01, which is the bottom bunk. Tr. 16:24–17:2; 41:2–15; 96:24–97:2; 119:17–120:13; Ex. D-1; Ex. D-14. Inmate Thomas Robinson had been assigned to and was sleeping on the top bunk in cell 1004 since he moved to SCI-Phoenix in July 2018, while he had been cellmates with another inmate. Tr. 54:23–55:4; Ex. D-2. Prior to Mr. Cooper's arrival and during a brief period when he was alone in cell 1004, Mr. Robinson moved his belongings from the top bunk to the bottom bunk because he believed he had an "understanding" that he would be reassigned to a bottom

3

bunk once his former cellmate moved out. Tr. 61:5–62:6. Mr. Robinson, however, never spoke with Unit Manager Luquis about making changes to his bed assignment on August 23, 2018. Tr. 61:5–15. Mr. Robinson's assignment to the top bunk in cell 1004 never changed during August 2018. Ex. D-2; Tr. 71:12–21. Once Mr. Cooper arrived, Mr. Robinson told Mr. Cooper that he (Mr. Robinson) had bottom bunk status because of a back injury. Tr. 17:3–19; 62:25–63:14. Additionally, at the time he moved in, Corrections Officer James Oslan placed Mr. Cooper's photograph above Mr. Robinson's just outside the cell, which Mr. Cooper took to mean that he was to sleep on the top bunk. Tr. 41:25–42:20. Unit Manager Luquis was not present for Mr. Cooper's move into cell 1004. Tr. 120:19–20.

On or around August 23, 2018, Mr. Cooper and Mr. Robinson approached Sgt. Whitman, telling him that they both had bottom bunk status. Tr. 17:3–19; 86:23–87:4. Sgt. Whitman confirmed their bunk statuses, but he never looked up the bunk assignments in cell 1004 that had been made by Unit Manager Luquis. Tr. 42:21–43:15. On August 24, 2018, Mr. Cooper complained to Unit Manager Luquis that he "had bottom bunk bottom tier status," but had been "placed on the top bunk in [cell] 1004" because "the person that was in there had bottom bunk status also." Tr. 20:6–22. Unit Manager Luquis replied that he "would look into it." Tr. 20:13–14. Mr. Cooper does not know what, if anything, Unit Manager Luquis did in response. Tr. 45:1–10. Typically, when presented with a complaint like this about a cell assignment, Unit Manager Luquis would have checked the bed assignment and the medical status, made changes if necessary, and directed unit staff to ensure that the assignment was enforced. Tr. 122:1–123:9. Mr. Cooper was not able to have any further conversations with Unit Manager Luquis about his housing situation prior to his seizure. Tr. 21:4–9; 45:11–25. Mr. Cooper

approached Ofr. Oslan and told him that he was staying in a top bunk and wanted to be reassigned to a bottom bunk, but Ofr. Oslan never had any conversation with Unit Manager Luquis about that request. Ex. P-12, Deposition of James Oslan, 11:4–12:2; 14:10–16. Ofr. Oslan described it as his job to enforce proper bed assignments to the greatest extent possible, but explained that cellmates have a responsibility too to ensure they were sleeping in their proper bunks. *Id.* at 20:7–13.

Mr. Robinson testified that he had a conversation with Unit Manager Luquis about the bed assignments in cell 1004 within a week prior to Mr. Cooper's seizure. Tr. 64:19–65:21. That conversation never took place—Mr. Robinson directly contradicted his deposition testimony, where he said that no such conversation occurred prior to Mr. Cooper's seizure. Tr. 77:25–79:22. By Mr. Robinson's account of his conversation, he told Unit Manager Luquis that that "Mr. Cooper is supposed to be on bottom bunk, bottom tier," and Unit Manager Luquis responded that Mr. Cooper had bottom bunk status, but Mr. Robinson did not. Tr. 64:19–65:10. In a later conversation, Unit Manager Luquis allegedly confirmed that Mr. Robinson indeed had obtained bottom bunk status. Tr. 65:11–21.

Unit Manager Luquis never threatened Mr. Cooper or expressed any hostility toward him. Tr. 46:1–47:20; 121:22–25. Mr. Robinson said that he overheard a conversation between Unit Manager Luquis, Ofr. Oslan, and Sgt. Whitman where Unit Manager Luquis said, in response to a conversation about Mr. Cooper, "F-ing I'm not moving anybody." Tr. 67:12–23; 81:14–20. Unit Manager Luquis, Ofr. Oslan, and Sgt. Whitman all deny any such conversation and comment, and Sgt. Whitman expressly noted that any such comment from Unit Manager Luquis would have been a direct

affront to his own professional expectations and personal faith. Tr. 99:11–100:5, 132:11–17; Ex. P-12 11:4–12:2, 14:10–16.

On August 28, 2018, Unit Manager Luquis received an email from Sergeant Roberts Stephany advising him that Mr. Cooper had a lower bunk status but was sleeping in a top bunk. Ex. P-1. Unit Manager Luquis does not recall receiving that email. Tr. 132:18–22.

On August 30, 2018, Mr. Cooper was resting on the top bunk in cell 1004 when he suffered a seizure, fell, and suffered injuries. Tr. 24:25–25:8. Mr. Cooper suffered a concussion, fractured nose, and lacerated tongue. Tr. 25:11–15.

## STANDARDS OF REVIEW

### A. Deliberate Indifference under Section 1983 and the Eighth Amendment

"Section 1983 provides a cause of action against any person acting under color of state law who 'subjects' a person or 'causes [a person] to be subjected ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Vega v. Tekoh*, No. 21-499, 2022 WL 2251304, at *4 (U.S. June 23, 2022). "'[C]onfinement in a prison ... is a form of punishment subject to scrutiny under the Eighth Amendment standards.'" *Rhodes v. Chapman*, 452 U.S. 337, 345 (1981) (quoting *Hutto v. Finney*, 437 U.S. 678, 685 (1978)). "'After incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)). Accordingly, a prisoner alleging inadequate attention to his medical needs in violation of the Eighth Amendment must show "deliberate indifference" to "serious" medical needs by a prison official to succeed

6

on the claim. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "[D]eliberate indifference describes a state of mind more blameworthy than negligence," and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Whitley*, 475 U.S. at 319). Claims "involving failure to assign a proper bunk to accommodate an inmate's medical needs are considered conditions of confinement claims pursuant to the Eighth Amendment's prohibition on cruel and unusual punishment," and therefore may be actionable under Section 1983. *Cameron v. Swartz*, No. 17-cv-816, 2020 WL 7496317, at *5 (W.D. Pa. Nov. 19, 2020) (citing *Glazewski v. Corzine,* 385 F. App'x 83, 89 (3d Cir. 2010)).

"To prevail against prison officials on a claim that an inmate's conditions of confinement violated the Eighth Amendment, the inmate must meet two requirements: (1) the deprivation alleged must be, objectively, 'sufficiently serious,' and (2) the 'prison official must have a sufficiently culpable state of mind.'" *Thomas v. Tice*, 948 F.3d 133, 138 (3d Cir. 2020) (quoting *Farmer*, 511 U.S. at 834). Accordingly, "[t]o be liable on a deliberate indifference claim, a defendant prison official must both 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety.'" *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (quoting *Farmer*, 511 U.S. at 837). "[S]ubjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk." *Id*. "[A] defendant can rebut a prima facie demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring." *Id*. Only those officials who are actually responsible for the

7

alleged Eighth Amendment violation may be held liable on a claim for deliberate indifference. *See Parkell v. Danberg*, 833 F.3d 313, 339 (3d Cir. 2016).

## B. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In determining the applicability of qualified immunity, I must examine 1) whether the facts shown "'make out a violation of a constitutional right'" and 2) "'whether the right at issue was clearly established at the time of defendants' alleged misconduct.'" *Karns v. Shanahan*, 879 F.3d 504, 520 (3d Cir. 2018) (quoting *Pearson*, 555 U.S. at 232). "A right is 'clearly established' when its 'contours ... [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). "The failure of either prong will result in application of qualified immunity." *Id.* (citing *James v. City of Wilkes–Barre*, 700 F.3d 675, 679 (3d Cir. 2012)).

When defining the right at issue, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al–Kidd,* 563 U.S. 731, 741 (2011)) (emphasis in original). "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018). "Because deliberate indifference under *Farmer* requires actual knowledge

or awareness on the part of the defendant, a defendant cannot have qualified immunity if [he] was deliberately indifferent." *Beers-Capitol*, 256 F.3d at 142 n.15.

### C.  Rule 50 Judgment as a Matter of Law

Federal Rule of Civil Procedure 50 provides that a court may enter judgment as a matter of law if it "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [non-moving] party on that issue." *See* Fed. R. Civ. P. 50(a)(1). In ruling on Unit Manager Luquis's motion, I must draw all reasonable inferences in favor of Mr. Cooper and can neither make credibility determinations nor weigh the evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Entry of judgment as a matter of law is appropriate "'only if, viewing the evidence in the light most favorable to the nonmovant [Mr. Cooper] and giving [him] the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability." *Warren v. Reading Sch. Dist.*, 278 F.3d 163, 168 (3d Cir. 2002) (quoting *Fultz v. Dunn,* 165 F.3d 215, 218 (3d Cir. 1998)). Put another way, "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Walter v. Holiday Inns, Inc.,* 985 F.2d 1232, 1238 (3d Cir. 1993) (quotation omitted).

### CONCLUSIONS OF LAW

Unit Manager Luquis did not disregard a substantial risk to Mr. Cooper. There is no dispute that Mr. Cooper's seizure disorder is a serious medical condition and his placement on a top bunk would violate his rights under the Eighth Amendment. *See Cameron*, 2020 WL 7496317, at *5. There is also no dispute that Unit Manager Luquis was aware that Mr. Cooper was sleeping in a top bunk. Mr. Cooper told Unit Manager

Luquis on August 24, 2022 that he had been assigned a top bunk in his cell, even though he had bottom-bunk status, and Unit Manager Luquis responded that he "would look into it." Tr. 20:13–14. Nevertheless, I find that Unit Manager Luquis took reasonable steps to prevent the harm from occurring, given that he indeed assigned Mr. Cooper to a bottom bunk, was not directly responsible for enforcement of bunk assignments, and may not have even known about Mr. Cooper's seizure disorder. In any event, any unreasonable action by Unit Manager Luquis does not rise beyond mere negligence.[1]

### A. Unit Manager Luquis reasonably responded to Mr. Cooper's complaint and medical concerns.

Unit Manager Luquis did not disregard an excessive risk to inmate health and safety, but rather took reasonable steps to prevent harm to Mr. Cooper, given his role and circumstances. *See Beers-Capitol*, 256 F.3d at 133. First and foremost, there is no dispute that Unit Manager Luquis, who was tasked with overseeing cell assignments in E-block, assigned Mr. Cooper to a bottom bunk in a bottom-tier cell on August 23, 2018, in compliance with Mr. Cooper's medical status. Tr. 16:24–17:2; 41:2–15; 96:24–97:2; 119:17–120:13; Ex. D-1; D-13; D-14. Additionally, Unit Manager Luquis did not book two prisoners to the same bunk in cell 1004. Rather he assigned Mr. Robinson, who also had bottom-bunk status, to the top bunk. Ex. D-2; P-16. I find that Unit Manager Luquis properly ensured that Mr. Cooper's cell and bed assignment were in compliance with his medical status.

Unit Manager Luquis testified that he does not remember receiving a complaint from Mr. Cooper about an allegedly improper bunk assignment, and relatedly did not

---

[1] Because I conclude that the facts shown do not make out a violation of a constitutional right, as Mr. Cooper does not show deliberate indifference under the Eighth Amendment, I need not address the parties' arguments concerning qualified immunity. *See Karns*, 879 F.3d at 520.

remember whether he took any actions in response to Mr. Cooper's complaint. Individual officials under Unit Manager Luquis also did not recall receiving a specific order to ensure that Mr. Cooper slept in the bottom bunk in his cell. Unit Manager Luquis credibly testified, however, that his standard practice when presented with a complaint of an erroneous bunk assignment would be to check the prisoner's housing assignment, make any necessary changes to the housing assignment, and give a direct and enforceable order to unit staff to carry out the assignment. Tr. 122:1–123:9. Unit Manager Luquis also credibly testified that he did not recall having any reason to think that staff were not carrying out housing assignments. Tr. 126:25–127:2. In a chaotic prison cell-block in the aftermath of a population transfer, it is unsurprising that prison officials do not recall particular one-off exchanges with individual prisoners. I find no evidence that Unit Manager Luquis acted contrary to his standard practices, and I conclude by a preponderance of the evidence that he followed these procedures.

Mr. Cooper argues that Unit Manager Luquis's preoccupation with the transfer from SCI-Graterford to SCI-Phoenix does not excuse his failure to address his serious medical needs, citing *Parkell*, 833 F.3d at 339, for the proposition that "[l]ogistical constraints unrelated to medical judgment typically do not excuse failure to provide adequate medical care." Doc. No. 79, at 11. However, the Third Circuit also states in *Parkell* that "there is a difference between actors who are actually responsible for those logistical constraints (or capable of remedying them) and actors who are not." 833 F.3d at 339 (finding defendants not liable for harms caused to plaintiff when they had no control over the issue which caused plaintiff to suffer harm). When running two units housing a combined 500 prisoners supported by a team of agents who are instructed to carry out the orders of the unit supervisor, it is not unreasonable for a unit supervisor to

look up the prisoner's bunk status and to direct his staff to execute the status. Unit managers are not the individuals who typically roam the hallways to make sure that their bed assignments are enforced. Unit Manager Luquis made the proper assignment and had the power to issue orders to staff. He reasonably responded to Mr. Cooper's medical concerns.

Unit Manager Luquis also credibly testified that he does not recall whether he was aware of the danger presented by Mr. Cooper's seizure disorder when Mr. Cooper made his complaint. Tr. 127:3–6. Mr. Cooper presents no evidence that he informed Unit Manager Luquis of his seizure disorder. Based on Unit Manager Luquis's standard practice in response to improper bed assignment complaints, it is unclear whether or not he would become aware of the seizure disorder through a search of prison records. *See* Ex. D-1 (Mr. Cooper's cell history); *but see* Ex. D-13 (Mr. Cooper's medical status summary, noting that he was granted bottom-bunk status because of a seizure disorder). No additional evidence demonstrates that Unit Manager Luquis knew of Mr. Cooper's seizure disorder. As Unit Manager Luquis persuasively argues, Mr. Cooper's serious medical risk would not become immediate apparent by virtue of his bunk assignment either, as bunk assignments can be granted for issues as relatively benign as back injuries. Doc. No. 77, at 9. Even if Unit Manager Luquis knew of Mr. Cooper's seizure disorder, he acted reasonably in assigning Mr. Cooper to the bottom-bunk and he would have reasonably responded to the complaint in the ordinary course of events by ordering his staff to enforce Mr. Cooper's bottom-bunk status.

Unit Manager Luquis demonstrated through a preponderance of the evidence that he properly assigned Mr. Cooper to a bottom-bunk in a bottom-tier cell and acted in compliance with his standard practices and procedures in addressing Mr. Cooper's

complaint. A preponderance of the evidence also demonstrates that Unit Manager Luquis was not immediately aware at the time of the complaint that Mr. Cooper faced serious risk by sleeping in a top bunk. In conclusion, I find that Unit Manager Luquis did not demonstrate deliberate indifference to Mr. Cooper's serious medical need.

**B. Any unreasonable conduct by Unit Manager Luquis in response to Mr. Cooper's complaint do not rise to the level of deliberate indifference.**

While I find Unit Manager Luquis's conduct to be reasonable, even if his conduct were unreasonable, it would not rise beyond mere negligence. When it comes to medical care, the Third Circuit has found that deliberately indifferent conduct can be found when

> (1) reasonable requests for medical treatment are denied, exposing the inmate to undue suffering or the threat of further injury; (2) necessary medical treatment is delayed for non-medical reasons; (3) arbitrary or burdensome procedures are erected to create treatment delays to suffering prisoners; and (4) inmates are presented from receiving access and treatment from capable medical professionals.

*Peet v. Beard*, No. 3:10-CV-482, 2015 WL 2250233, at *8 (M.D. Pa. May 12, 2015) (citing *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346–47 (3d Cir. 1987)). Furthermore, "persistent conduct in the face of resultant pain and risk of permanent injury" may be sufficient to show deliberate indifference. *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990). On the contrary, the Supreme Court has described "an inadvertent failure to provide adequate medical care" as not constituting "an unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Even if I found Unit Manager Luquis's response to Mr. Cooper's claim to be unreasonable, it would be merely inadvertent conduct, as at worst he neglected to follow-up to ensure enforcement of his proper bed assignment following a single complaint.

13

The Middle District of Pennsylvania, in a similar matter, found that a prisoner plaintiff could not hold prison officials liable for an Eighth Amendment violation when he was assigned bottom-bunk status, claimed to have been placed in a top bunk, and fell the next day after suffering a sleeping seizure, as this conduct was at most negligent. *Murray v. Wetzel*, No. 17-cv-491, 2019 WL 1303217, at *8–9 (M.D. Pa. Mar. 1, 2019), *report and recommendation adopted*, No. 17-cv-491, 2019 WL 1298826 (M.D. Pa. Mar. 21, 2019). If officials could not be found deliberately indifferent in that matter, I find it difficult to reach a contrary conclusion here.

The Third Circuit, in another deliberate indifference case, held that a Youth Development Center unit official's failure to notify the executive director of allegations of sexual assault "is evidence of negligence in the performance of his job, but it does nothing to support the claim that he knew or must have known of the excessive risk to the plaintiffs." *Beers-Capitol*, 256 F.3d at 141. Even if Unit Manager Luquis indeed failed to notify his unit staff about Mr. Cooper's situation, Mr. Cooper presents no evidence that such failure to notify staff was anything more than inadvertent. While I conclude that Unit Manager Luquis reasonably responded to Mr. Cooper's complaint and properly accommodated his serious medical condition, any contrary finding on these facts would not rise to the level of deliberate indifference.

### C.  I will deny Unit Manager Luquis's Rule 50 motion for judgment as a matter of law.

While I will enter judgment in favor of Unit Manager Luquis, I will do so on the basis of my findings of fact and conclusions of law rather than his Rule 50 motion for judgment as a matter of law. As a practical matter, it is difficult to justify performing the analysis necessary to determine a Rule 50 motion in the context of a bench trial. Rule 50

requires me to view "'the evidence in the light most favorable to the non-movant and giv[e] it the advantage of every fair and reasonable inference,'" and determine if "'there is [ ]sufficient evidence from which a jury reasonably could find liability.'" *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 383 (3d Cir. 2004) (quoting *W.V. Realty Inc. v. N. Ins. Co. of New York,* 334 F.3d 306, 311 (3d Cir. 2003)). The quanta of factual and legal analysis necessary to make a Rule 50 decision seem about the same as that necessary to reach a verdict, although a different standard applies. If I were to decide the Rule 50 motion against Unit Manager Luquis, I would still have to make findings of fact and conclusions of law in my role as the finder of fact at trial. If I were to grant a Rule 50 motion, it would risk the appeal of a remedy that is meant to be granted "sparingly," and hence is more likely to be overturned on appeal. *See id*. This seems injudicious.

 Rather than engage in this inefficiency, I will not perform a Rule 50 analysis, but will instead enter a verdict in favor of Unit Manager Luquis based on my findings of fact and conclusions of law. I will deny the Rule 50 motion as moot.

## CONCLUSION

For the reasons discussed, I find that Unit Manager Luquis did not exhibit deliberate indifference toward Mr. Cooper's serious medical need by not personally ensuring that his bottom-bunk assignment was being enforced. Accordingly, I will enter a verdict in favor of Unit Manager Luquis.

**BY THE COURT:**

*s/ Richard A. Lloret*
**RICHARD A. LLORET**
**U.S. Magistrate Judge**

15